UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION -- LEXINGTON

| | |
|---|---|
| LARRY BOWLES and AUSTIN BOWLES, Co-Administrators of the Estate of Shannon Bowles, *deceased*, and Next Friends of his minor children, T.B.B., N.H.S.B., C.D.B., M.W.B., and B.W., | CIVIL ACTION NO. 5:17-434-KKC |
| Plaintiffs, | |
| V. | OPINION AND ORDER |
| Advanced Correctional Healthcare, Inc.; Matthew P. Johnston, ARNP; Trena Preston, ARNP; Kelly Cox-Lynn, LPN | |
| Defendants. | |

*** *** ***

On April 15, 2016, Shannon Bowles was arrested and transported to the Bourbon County Detention Center where he was booked for public intoxication of a controlled substance and heroin possession. He died of a brain abscess fourteen days later. This case is about what unfolded in those fourteen days while Bowles was incarcerated.

Larry Bowles and Austin Bowles, Co-Administrators of the Estate of Shannon Bowles and Next Friends of his remaining minor children, T.B.B., N.H.S.B., C.D.B., M.W.B., and B.W. (collectively "Plaintiffs"), filed this action on October 31, 2017, challenging several parties on behalf of Bowles for his death. Now, Plaintiffs' remaining claims are against Advanced Correctional Healthcare, Inc. ("ACH") and its employees— Matthew Johnston, Trena Preston, and Kelly Cox-Lynn (the "ACH Defendants").

Plaintiffs filed suit under 42 U.S.C. § 1983, alleging that the defendants violated Bowles's constitutional right to adequate medical care. They also allege state law claims of

negligence, gross negligence, and wrongful death. In this case, however, because Plaintiffs cannot establish that Defendants were deliberately indifferent to a serious medical need, the claims against each remaining defendant will be dismissed and Defendants' motions for summary (DE 63) will be granted.

## I. BACKGROUND

The Bourbon/Nicholas Regional Jail Authority, located in Paris, Kentucky, contracted with ACH to provide medical care to inmates and pretrial detainees housed at the Detention Center. (*See* DE 80-1). ACH contracted Matthew Johnston, ARNP to serve as primary nurse practitioner for Bourbon County Detention Center. (DE 74-4 at 10). Johnston, as the primary provider, visited the jail once a week to examine inmates— generally seeing those who display more chronic issues (*see* DE 74-3 at 14); otherwise he would be available by phone twenty-four hours a day. (*Id*. at 11-12). He began providing care in a correctional setting in 2014. (*Id*. at 6). Johnston lived in Madisonville, Kentucky, which was roughly a three and a half to four-hour commute to the Detention Center. (*Id*. at 10). When Johnston was not present at the Detention Center and also could not be available my phone, Trena Preston— another nurse practitioner contracted with ACH — was available by phone. (DE 74-5 at 32-34).

ACH also provided on-site nursing coverage for the Detention Center. Kelly Cox-Lynn, a licensed practical nurse, worked part-time, alternating between Mondays and Fridays one week and Saturdays and Sundays the next week. (DE 74-3 at 11–12). Typically, on days she worked, she arrived at the jail at 8:00 a.m. and left between 3-3:30 p.m., or later, depending on any ongoing circumstances. (*Id*. at 13). Another nurse filled in on days that Nurse Cox-Lynn was not present. Cox-Lynn did not create orders or treatment plans for inmates, but relied upon the orders and directives initiated by the nurse practitioners with whom she

worked. NP Johnston, NP Preston, and Nurse Cox-Lynn are the only three medical professionals who provided medical services at the Detention Center relevant to this matter.

Pursuant to the Detention Center's policy, inmates notified jail personnel of their medical needs by filling out sick call request forms. (*See* DE 80-2 at 2). The deputy jailer on duty would take the sick call forms when on rounds and drop them off to the medical providers; should no one be present, the slips would be left in a file for them to retrieve and inspect. (DE 74-3 at 50-51). After picking up the sick call slips, the inmates would be brought to the medical office for examination. (*Id.*). Because NP Johnston was not often on-site, Nurse Cox-Lynn would place a call to Johnston on a Detention Center telephone and take down any orders she received from him. If Johnston was not available, Nurse Cox-Lynn would attempt to call another medical provider, generally NP Preston. Nurse Cox-Lynn would then carry out any orders given by the relevant medical provider. Only practitioners created individual orders for inmates.

The deputy jailers at the Detention Center also had the authority to call ACH medical providers and were bound to follow the medical staff's instructions regarding inmate treatment. Further, they had the authority to send an inmate to the hospital for treatment without any orders or approval from ACH medical staff. (DE 61-5 at 12).

This was the system that was in place when Bowles arrived at the Bourbon County Detention Center on March 15, 2016.

## II. FACTS

On March 15, 2016, at approximately 4:30 a.m., Shannon Bowles ("Bowles") was arrested by the Cynthiana Police Department and charged with public intoxication of a controlled substance. (DE 63-2). Around 6:45 a.m., he was taken to the Bourbon County Detention Center ("BCDC"), where the booking process began. (DE 63-3). While Bowles began

undressing, three small pieces of aluminum foil — later revealed to be heroin — fell out of his boxers. He was subsequently cited for heroin possession and ordered to be evaluated for drug ingestion. (*Id.*; DE 61-14).

According to the medical progress note, at approximately 7:30 a.m., Bowles was examined by Donna James, RN ("James"), who checked his vitals and performed a neurological examination. (DE 61-14). She noted that Bowles's pupils were 1 mm and nonresponsive. He appeared nervous and his hands were shaking. (*Id.*). Bowles revealed that he had ingested Klonopin (clonazepam) and marijuana, followed by cocaine and methadone. (*Id.*). The treatment plan was for Bowles to visit the emergency room for further evaluation.

At approximately 8:03 a.m. Bowles arrived at the Bourbon Community Hospital, where he was evaluated by emergency department (ED) physician Babatunde Sokan, MD. (DE 63-5; *see also* DE 61-17). While there, Bowles admitted to using cocaine and heroin, but was unwilling to be drug tested since he was reportedly "fine." (DE 63-5 at 1). His symptoms were documented as mild "[a]t their worst" and remained "unchanged" throughout his visit. (*Id.* at 1, 3). Overall, his condition was marked as "stable" and no physician-assisted procedures were completed; nor were medications administered. (*Id.* at 3, 5). He was declared to have "no functional deficits." (*Id.* at 5). The ultimate diagnosis was "substance abuse." (*Id.* at 3, 6; DE 61-17 at 1).

Around 8:23 a.m., Bowles was discharged and left the hospital with instructions that he be monitored "closely" and return to the hospital if he became "symptomatic." (*Id.*). Upon returning to the BCDC, Bowles was evaluated by Defendant, Nurse Practitioner Matthew Johnston, ARNP ("Johnston"). According to Johnston's notes, Bowles's vital signs were normal, and he was reportedly alert and oriented, but fidgety. (DE 63-6). In the "assessment" section, Johnston indicated that Bowles was experiencing nausea, diarrhea, and suffered

from substance abuse, listing "Heroin, Marijuana, Percocet". (*Id*.). After the interaction, Johnston prescribed Bowles 25 mg. of Vistaril (for nausea) and 20 mg. of Bentyl (for diarrhea) – each to be taken for 3 days. (*Id*.; DE 63-7 at 18). At discharge, Johnston told Bowles to follow-up "as needed" and told not to do any drugs.

On March 16, 2016, Bowles completed his first sick call request form. There, he explained that he was having headaches, trouble sleeping, and experiencing sinus pressure. (DE 63-8, DE 74-3 at 50). He was seen the next day, on March 17, by the on-site licensed practical nurse ("LPN"), Defendant Kelly Cox-Lynn ("Cox-Lynn"). (DE 63-9 at 4, DE 74-3 at 50). She took Bowles's vital signs, but saw nothing "remarkable." (DE 74-3 at 57). When asked exactly where he was experiencing pain, Bowles patted his cheekbones to describe the pressure. (DE 63-9 at 16). Following the exchange, Nurse Cox-Lynn called the practitioner that was on call to relay the symptoms. (*Id*.). Bowles was prescribed Amoxicillin (for the possible sinus infection) and Tylenol (for pain relief and comfort). (*Id*.; *see also* DE 63-10). There is no evidence that Bowles experienced any complaints or sought medical assistance on March 18-21.

On March 22, 2016, Johnston returned to the BCDC for his weekly shift. (DE 74-4 at 17). He reviewed paperwork regarding Bowles's March 17, 2020 visit by Cox-Lynn, but did not visit Bowles.[1]

On March 23, 2016, at approximately 4:09 a.m., Deputy Eric Knipper and Deputy Kim Wilson responded to a call from Mr. Bowles' cell.[2] (DE 63-13). According to Deputy Knipper's

---

[1] Typically, when Johnston visited the BCDC, he saw a list of about a dozen to fifteen patients who were experiencing "chronic" issues. Bowles was not seen during Johnston's weekly visit because he was not put on the nurse's list of patients to be seen. (*See* DE 74-3 at 13-15).

[2] According to Defendants, "[m]edical personnel are not on-site at [the BCDC] 24/7. In the event a medical event arises in that time frame, the jail staff has the ability to immediately send the inmate out for care at a hospital if necessary or to gather information from the inmate and convey it to an on-call medical provider." (DE 63-1 at 5).

incident report—generated at 4:48 a.m.—Bowles was shaking, had a "migraine," and "felt he was going to pass out" upon the officers' arrival. (*Id*.). Given his condition, Nurse Practitioner Trena Preston ("Preston") was called,[3] who ordered a 25 mg. dose of Vistaril (for withdrawal), a 500 mg dose of Tylenol (for pain), and requested that Bowles be seen by a nurse in the morning. (DE 63-11).

At 10:00 a.m. later that day, Nurse Cox-Lynn assessed Bowles. (DE 63-15). The medical progress note reports that Bowles complained of a headache, neck pain, sinus pressure, nausea, and vomiting. His vitals were normal and he listed no other complaints. The medical note also states that Bowles was to follow-up "as needed", as well as rest and use "warm compression" to alleviate the sinus pressure. (*Id*.). Following the evaluation, Cox-Lynn called NP Preston to relay Bowles's symptoms. She advised that Bowles was having a headache and sinus pressure, and that Bowles's sinus cavities felt very tender. (DE 63-14 at 8). Preston prescribed Dilotab[4] twice daily for 3 days. (*Id*.).

On March 26, 2016, Bowles completed a sick-call request form. He complained of "migraine headaches[,] really bad leg cramps", and stated that he had not been sleeping. (DE 63-16). Another sick call request form was filled out the next day, on March 27. (*See* DE 63-9 at 56-58). Bowles's complaints included sinus pressure, headache, and nausea/vomiting. (DE 63-17). The March 27 progress note indicated that Cox-Lynn saw Bowles on that day, but no exact time is listed. The neurological exam section states that Bowles had shaky hands and dilated pupils, but his vitals were reportedly normal and his eyes were within normal

---

[3] Nurse Practitioner Trena Preston was the secondary call physician, in the event Johnston was not available. (DE 63-14 at 5). On the day of March 23, between 4 and 5 a.m., Preston was awoken by a call from Deputy Knipper. (*Id*. at 7). Knipper revealed that Bowles was withdrawing and mentioned that Bowles had finished his Vistaril. She was concerned that Bowles might need more Vistaril for the withdrawal, and directed that he been seen by a nurse in the morning. (*Id*.).

[4] Dilotab is a combination of Tylenol and pseudoephedrine. (DE 63-14 at 8). It is prescribed to relieve sinus cavity congestion. (*Id*.).

limits. (DE 63-18). NP Preston was notified of Bowles's condition, whose plan was for Bowles to rest and drink lots of fluids. (*Id.*).

At approximately 1:51 p.m., Deputy Harry Laytart responded to a radio call that Bowles wanted to be seen by a deputy. When the officer arrived, Bowles reported that he "needed to see medical [, and that] he was complaining of a migraine headache and dizziness." (DE 63-19). Thereafter, Deputy Laytart took Bowles to see Cox-Lynn, who checked his vital signs, and asked questions about his symptoms and the location of his pain. He told her that his head was still hurting and that "he needed something for it." (*Id.*). She advised Bowles that she would call the on-call nurse practitioner to determine the next course of action; however, in the meantime, he "needed to go back to his cell…[,] lay down and place a cold wash cloth over his head[,] and try to relax until she got a hold of the practitioner." (*Id.*). Around 1:43 p.m., Deputy Laytart escorted Bowles back to his cell in a wheelchair, in order "to avoid any chances of him falling due to his dizziness." (*Id.*).[5]

Around 2:00 p.m., Deputies Amie Kearns and Justin Hughes responded to a call at Bowles's cell. (DE 63-21). Neighboring inmates reported that Bowles had passed out in the bathroom and required assistance. According to the incident report, "Bowles stated … that he was in extreme pain in his head and neck area." (*Id.*). Nurse Cox-Lynn was also summoned, and called NP Preston to update her on Bowles's condition. The nurse informed her that Bowles's pupils were dilated and that he was shaking. (DE 63-14 at 38). Upon hearing this, Preston told Cox-Lynn that Bowles needed to get to the hospital; it was possible he was having a stroke. (*Id.* at 49-50).

---

[5] A second incident report, generated by Deputy Brittany Leandra Sidney, confirms these events. (*See* DE 63-20). She, along with Deputy Hughes, took Bowles to see Nurse Cox-Lynn after he reported to have a migraine and was feeling a "little dizzy." (*Id.*). Upon arriving, the nurse checked his vitals and told Bowles that she would call the nurse practitioner. In the meantime, Bowles was told to go back to his cell, lay down, and place a cold washcloth over his head. (*Id.*). Deputy Sidney went to retrieve a wheelchair "to avoid any falls." (*Id.*). After they got Bowles to his cell, he laid down to rest.

Bowles arrived at the Bourbon Community Hospital emergency department at around 2:12 p.m. (DE 63-23). Deputy Hughes — who transported Bowles there — had to carry him into the hospital since he could not walk on his own. (DE 61-8 at 15; *see also* DE 63-21). Shortly after, Bowles was given a triage assessment, physical and neurological examinations, and a CT. The medical report lists that Bowles tested positive for body aches, chills, fatigue, malaise, nausea, vomiting and diarrhea. (DE 63-23 at 1-2). He showed no neurological deficits, except a headache. (*Id*. at 2). He displayed no signs of respiratory distress. He was oriented to person, place, time and situation. His mentation and memory were normal. (*Id*.).

The report also indicates that Bowles's behavior and mood were cooperative. He was alert and awake. His pupils were equal, round, and reactive to light and accommodation. (*Id*.). His extraocular movements were intact. His deep tendon reflexes were normal. His cardiovascular rate and rhythm were also normal. (*Id*.).

The CT scan showed there was a large, right temporal lobe mass, but no herniation at the time of the scan, and likely consistent with high grade primary malignancy. (DE 63-24). Deputy Hughes reported that, as he waited with Bowles, he repeatedly requested water. (DE 64-21). As time passed, he observed Bowles lean over and look like he was going to sleep. (*Id*.). About 15-20 minutes later, a paramedic attempted to wake up Bowles, but he was not responsive to commands. (*Id*.; *see also* DE-63-23 at 9).

At approximately 4:07 p.m., Bowles "[s]uddenly became unresponsive" and had seizure-like activity. (DE 63-23 at 3). He was intubated and transferred to the University of Kentucky ("UK") Medical Center, via helicopter. *(Id)*. He arrived at UK Medical Center around 4:56 p.m. (DE 63-25). A CT scan showed a large mass within the right temporal and parietal lobes, measuring 4 cm. in greatest diameter. (DE 63-26). Additionally, it showed a 10 mm. midline shift to the left, which had "increased in comparison to prior exam [at the

8

hospital]." (*Id.*). The mass effect near "the medial right temporal lobe … [was] beginning to herniate [which] … could represent a neoplastic process or a cerebral abscess." (*Id.*).

Bowles was officially declared dead on March 29, 2016. (*See* DE 63-28). The cause of "[d]eath is attributed to severe sepsis with brain abscess, endomyocarditis, and hemorrhagic bronchopneumonia in the setting of intravenous drug use." (DE 63-27). According to the Fayette County Coroner's Office, Bowles's death was likely contributed to chronic drug abuse. (DE 63-28). And the cause of death lists a right tempoparietal mass due to chronic drug use. (*Id.*).

Plaintiffs filed suit on October 31, 2017 pursuant to 28 U.S.C. § 1983, alleging federal constitutional and state law[6] claims. (DE 1). An amended complaint was filed on January 16, 2018, alleging five counts. (DE 14). Count One alleges that Defendants' conduct constitutes deliberate indifference resulting in "cruel and unusual punishment and ultimately deprived [Bowles] of his life without due process" in violation of the Eighth, Tenth, and Fourteenth Amendments of the United States Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C § 1983. (*Id.*, ¶ 31). Count two alleges state law claims of negligence and gross negligence and that the medical professionals responsible for Bowles' care failed to meet the standard of care applicable to the professions. (*Id.*, ¶ 32). Count three alleges that this is a wrongful death action pursuant to KRS § 411.130. (*Id.*, ¶ 33). Count four alleges that Defendants are obligated to pay all medical expenses incurred after Bowles left the detention center pursuant to KRS § 441.045(3). (*Id.*, ¶ 34). Finally, Count five alleges that Defendants

---

[6] Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over all civil claims arising under the Constitution, laws, or treaties of the United States; this includes 42 U.S.C. § 1983. As to state law claims, a federal court can maintain pendant jurisdiction over state law claims if both the state and federal claims derive from a common nucleus of operative fact and if the plaintiff would be expected to try all of her claims in one judicial proceeding. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

have been unjustly enriched "to the extent of the medical expenses incurred in the futile attempt to save Mr. Bowles' life." (*Id.*, ¶ 35).

Plaintiffs seek actual damages for: (i) Bowles's lost future income, (ii) Bowles's mental and physical pain and suffering, (iii) the minor children's loss of his love, society, support and companionship, and (iv) Plaintiffs' expenses incurred in the funeral and burial of Bowles; (b) punitive damages; (c) costs; (d) attorneys' fees; (e) pre and post-judgment interest on all sums awarded; and (f) all other relief to which Plaintiffs', the estate, and his minor children are entitled under law or in equity. (*Id.*, at 11-12).

### III.  Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the nonmoving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine dispute for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). This is so because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323-24.

"A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the nonmoving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson*, 477 U.S. at 255). The nonmovant "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted). However, the Court is under "no … duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Viewing the evidence in the light most favorable to the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999).

## IV.   Analysis

### A. Bowles's § 1983 Claim of the Constitutional Right to be free from Cruel and Unusual Punishment Against the ACH Defendants.

The Constitution requires the Government, and those who have been delegated governmental power, "to provide medical care for those whom it is punishing by incarceration," and "the failure to provide such medical care may result in a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Harrison v. Ash*, 539

11

F.3d 510, 518 (6th Cir. 2008) (quoting *Estelle v. Gamble*, 428 U.S. 97, 103 (1976)). "Although the Eighth Amendment's protections apply specifically to post-conviction inmates, through the Fourteenth Amendment prison officials are forbidden from unnecessarily and wantonly inflicting pain on a pretrial detainee by acting with deliberate indifference to his serious medical needs. *See Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010); *see also Estelle*, 429 U.S. at 104.

"To sustain a cause of action under § 1983 for failure to provide medical treatment, [a] plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle*, 428 U.S. at 104). "Deliberate indifference is a stringent standard of fault.*" Miller v. Calhoun Cty.*, 408 F.3d 803, 815 (6th Cir. 2005). It is not "mere negligence." *Watkins*, 273 F.3d at 686. After all, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Nor does "every claim by a prisoner that he has not received adequate medical treatment state[ ] a violation of the Eighth [or Fourteenth] Amendment." *Id.* at 105.

"[I]n the medical context, an inadvertent failure to provide medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Id.* at 105-06. Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment." *Id*. Similarly, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

12

A deliberate-indifference claim has objective and subjective components." *Jones*, 625 F.3d at 941. The objective component requires the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). Such a medical need has been defined as one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison*, 539 F.3d at 518 (citations omitted). A claimant may satisfy the subjective prong of this inquiry by establishing that "the official knows of and disregards an excessive risk to inmate health or safety," which is to say "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Regarding the latter, to prove the required level of culpability, a plaintiff must allege facts, which if true, would show that: "(1) 'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner;' (2) the official 'did in fact draw the inference;' and (3) the official 'then disregarded that risk.'" *Anthony v. Swanson*, No. 16-3444, 2017 WL 2992224, at *2 (6th Cir. Jul, 14, 2017) (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). Under this framework, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot … be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. The "plaintiff bears the onerous burden of proving the official's subjective knowledge." *Comstock*, 273 F.3d at 703. "It is not enough for plaintiff to demonstrate a question of fact whether the [defendants] should have known" that there was a substantial risk of harm. *Watkins*, 273 F.3d at 686.

In this case, the Court concludes that Bowles's constitutional claims do not clear the necessary hurdles to place this case in front of a trier of fact. Accordingly, the Court will grant Defendants' motions for summary judgment as to the federal constitutional claim.

13

B. **Claims Against ACH's Individual Medical Providers**

Section 1983 requires a plaintiff to establish the following two elements: (1) the defendant acted under the color of state law; and (2) the defendant's conduct deprived the plaintiff of a federally guaranteed right. *Handy–Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012). Medical professionals who render services to inmates at a county prison qualify as state actors for the purposes of § 1983. *See Harrison*, 539 F.3d at 521 (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)).

Defendants do not dispute that, assuming Bowles has established the objective component of his Fourteenth Amendment claim, he still cannot meet the subjective-prong burden. (*See* DE 63-1 at 16). Although the treatment Bowles received was ultimately unsuccessful as he later died, this fact is of no consequence to whether the Defendants were deliberately indifferent to Bowles's serious medical need. Whether Nurse Practitioners Johnston and Preston, and Nurse Cox-Lynn, were each deliberately indifferent to a serious medical need is a matter of application of law to the facts.

i. **Matthew P. Johnston, ARNP is Entitled to Summary Judgment**

Nurse Practitioner Johnston had one personal interaction with Bowles on March 15, 2016. Following Bowles's return to the hospital for drug ingestion, he was evaluated by Johnston and prescribed a three-day dose Vistaril and Bentyl for his withdrawal symptoms.(DE 63-6). Bowles was instructed to follow-up "as need" and told not to do drugs. (*Id*.). Then, on March 17, 2016, the medical progress note reflects that Johnston prescribed Bowles 500 mg. of Amoxicillin (twice daily for seven days) for the sinus pressure he was complaining of, and 100 mg. of Tylenol (twice daily for three days) for the complained-of head pain. Bowles had no other complaints and was instructed to follow-up as needed. He was not seen when Johnston was back at the Detention Center, on March 22nd, because Bowles had not submitted a sick call request, and otherwise did not have reason to believe that Bowles

14

required immediate attention. Johnston was not contacted regarding Bowles again, nor had any interaction with him prior to his death on March 29.

Plaintiffs allege that NP Johnston was negligent for failing to abide by the standard of care for prisoners who are experiencing complications of withdrawal; and specifically, that no "withdrawal flow sheet" was ever utilized. (DE 73 at 20-21; *see* DE 73-3). He claims that Johnston essentially "abandoned" Bowles after seeing him on March 15. However, none of these assertions or the facts in the record creates a material issue as to Johnston's knowledge about the severity of Bowles's medical condition or as to whether he recklessly disregarded any knowledge that she may have inferred. Assuming Johnston had violated a stated policy, "deliberate indifference cannot be based solely on a violation of company policy       " *Rice v. Montgomery Cty.*, No. 5:14-CV-181-KKC, 2016 WL 2596035, at *12 (E.D. Ky. May 5, 2016). Instead, the Court must look to what Johnston actually knew at the time he treated Bowles and what he did with any knowledge he had.

Johnston treated Bowles for the condition that he thought he had — withdrawal. When he first saw Bowles, he had just been cleared from the hospital; even prior to that, Bowles was evaluated by Nurse Cox-Lynn and his vitals came back as normal. There is no evidence in the record to suggest that Johnston was aware of what was actually ailing Bowles. Even if Johnston had seen Bowles after the March 15th visit, nothing in that monitoring could have played into what he knew at the time he gave orders. And Bowles was always instructed to follow up and report needing to be seen for treatment.

While it is true that no detox flow sheet was used (*see* DE 73-3), as Plaintiffs take issue with, based on the facts Johnston received, his decision to treat Bowles for withdrawal in the manner he did was not "so cursory as to amount to a conscious disregard of his needs." *Rouster*, 749 F.3d at 448. It also does not mean that he was deliberately indifferent. *See Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering a failure to follow

15

policy as evidence that the subjective component of a deliberate indifference claim has been met). Moreover, Plaintiffs' two retained experts— Robert Pfalzgraf, M.D. and Renee Dahring, ARNP— while not causation experts, have concluded that Bowles's death was not attributed to drug withdrawal (*See* DE 63-30 at 10; DE 63-32 at 19). Thus, even if NP Johnston could have done more, the facts do not show that Bowles had a more serious condition than severe head pain and sinus pressure, and they certainly do not show that Johnston consciously disregarded any risk to a serious medical need.

### ii.  Trena Preston, ARNP is Entitled to Summary Judgment

Bowles's claims against NP Preston equally fails. Like his claim against Johnston, Bowles faults and seeks to hold Preston liable for failing to follow specific withdrawal protocols, for "violat[ing] the standard of care by relying upon incomplete information", and by failing to not ask any questions regarding Bowles's symptoms. (DE 73 at 21). From these alleged failures, Bowles argues that Preston did not receive enough information to make a sufficient medical judgment, which caused Bowles to not be adequately monitored. (*Id*.).

However, what matters here is that Preston was not aware of facts from which it could be inferred that a substantial risk existed, and it is nevertheless clear from the evidence that she did not draw an inference. When she received the call from Nurse Cox-Lynn, she was told that Bowles had head and neck pain, and sinus pressure— ultimately prescribing an antihistamine to relieve Bowles's sinus issues. (DE 63-15). While she could have done more, the facts do not show that Preston was aware that Bowles was suffering from drug withdrawal or perceived a more serious medical condition, for that matter. Indeed, the facts do not show that she consciously disregarded any risk to a serious medical need—including any symptoms relayed by Nurse Cox-Lynn. Only on March 27th, when Preston received the second phone call from Nurse Cox-Lynn, describing the events from that day, and noting that Bowles had passed out, was it concluded that Bowles's transport to the hospital was essential.

At bottom, Preston received two calls regarding Bowles's symptoms, and gave orders regarding what she thought could be ailing Bowles. Her actions may have not been perfect, but they were not indifferent so as to rise to the level of a constitutional violation.

### iii.   Kelly Cox-Lynn, LPN is Entitled to Summary Judgment

Nurse Kelly Cox-Lynn timely responded to the three sick call requests that Bowles submitted on March 17th, 23rd, and 27th. Each time, she listened to Bowles's complaints, conveyed his symptoms to the on-call nurse practitioner at the time, and carried out the prescribed orders.

Plaintiffs contend that Nurse Cox Lynn "failed in many respects[,]" such as by not providing complete assessments, compromising his diagnosis, and failing to initiate any follow up. (DE 73 at 21-22). However, the Court cannot conclude based on her interactions with Bowles that Nurse Cox-Lynn was deliberately indifferent to a serious medical need. She was not subjectively aware that Bowles was experiencing anything other than drug withdrawal. She did not consciously disregard Bowles's complaints and needs; nor did she fail to treat what she thought were symptoms of withdrawal. Much like his charges against Nurse Practitioners Johnston and Preston, Bowles argues that Nurse Cox-Lynn was deliberately indifferent in the way she treated Bowles based on what she *did not* do and what she *could have* done to provide better treatment. But his provision of treatment was not unreasonable in response to the symptoms Bowles exhibited, *Farmer*, 511 U.S. at 844–45, because, as stated above, there is no indication that the nurse perceived Bowles's ailments as anything other than drug withdrawal.

As the Sixth Circuit has stated, "a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise

to the level of a constitutional violation." *Comstock*, 273 F.3d at 703 (internal citations omitted). The Court can only "judge [Defendants'] actions based on the information that was available to them at the time." *Rouster*, 749 F.3d at 453. Therefore, Plaintiffs has failed to create a genuine dispute as to any material fact, and these defendants are entitled to summary judgment on the deliberate-indifference claim.

## C.  Bowles's § 1983 Claim Against Advanced Correctional Healthcare

Plaintiffs argue that ACH's failure to establish policies, procedures, and customs ultimately led to Bowles's death; and further, that ACH "failed to properly train its medical providers on the proper procedures and protocols to use. (DE 73 at 18-19). As a private corporation in the § 1983 context, ACH can be held liable under theories similar to municipal liability. *See Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting 'under color of state law.'"). However, for ACH to be liable, Bowles must identify some custom, policy, or procedure that caused a violation of his Fourteenth Amendment rights. *See Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 989 (6th Cir. 2010) (citing *Perez v. Oakland Cty.*, 466 F.3d 416, 430 (6th Cir. 2006)). Bowles's claim against ACH must fail because there are no underlying constitutional violations in this case. *Rouster*, 749 F.3d at 454.

Additionally, there is no evidence that the alleged absence of any specific written policy, procedure, or protocol caused Bowles's death. And, to that effect, the agreement between ACH and the Detention Center specifically noted that:

> ACH staff will operate within the requirements of the JAIL ADMINISTRATOR's policies, procedures, and protocols as communicated to ACH staff by the JAIL ADMINISTRATOR or designee. Such policies, procedures, and protocols may change from time to time; if so, the JAIL ADMINISTRATOR or designee will promptly notify ACH staff, provide them with a written copy of the modified policy, procedure, or protocol, and provide any necessary training to the ACH staff. Upon the JAIL ADMINISTRATOR's

18

request, ACH will assist the JAIL ADMINISTRATOR in drafting <u>medical policies, procedures, and protocols</u>."

(DE 80-1 at 3, ¶ 1.10). Regarding the latter, at no time, did the jail administrator in March 2016, Gary Wilson, ask ACH staff to participate in drafting or revising any policies, procedures, and protocols. (*See* DE 76-7 at 32-33).

We need not consider whether ACH's policies (or lack thereof) might have caused such a violation. ACH is therefore entitled to summary judgment.

## D. <u>Remaining State Law Claims</u>

Having found no constitutional violations, summary judgment has been granted on all § 1983 claims in favor of the remaining defendants in this case. The § 1983 claims served as the sole basis for federal jurisdiction. Now without a federal hook, the Court declines to exercise supplemental jurisdiction over Bowles's state law claims. As has been shown above, there are significant state-law related issues in this case all related to complex and sensitive issues regarding negligence and medical care for prisons. The state courts, as a "surer-footed read[er] of applicable law," are best suited to resolve them. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Moon v. Harrison, Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (citation omitted) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."); *see also Rouster*, 749 F.3d at 454 (upholding a district court's decision to decline supplemental jurisdiction over remaining state-law claims after the district court disposed of constitutional deliberate indifference claims). Bowles may pursue the remaining claims in the appropriate state court.

## V.  CONCLUSION

The "Constitution . . . erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006). To say that this is a tragic case would be a gross understatement. A

father lost his life while incarcerated, despite his protestations and attempts from both jail and medical staff to treat him. Bowles's death may well have been avoided. Had jail officials and medical personnel known what was truly ailing Bowles, they may have been able to save his life, or, perhaps, different decisions would have been made in the crucial days and hours. "But the Fourteenth Amendment does not permit claims against jail officials [and medical professionals] for negligence, that is, claims regarding what [they] *should* have known or *should* have done." *Ritz-Bueno v. Scott*, 639 F. App'x 354, 361 (6th Cir. 2016) (emphasis in original). Rather, the Constitution focuses on the defendants' mental state to isolate those defendants who inflict punishment because, after all, the "Eighth Amendment [and the Fourteenth Amendment corollary] . . . outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. On this narrow question—whether any of the defendants knew of and consciously disregarded a substantial risk of harm—the Court cannot answer in the affirmative. This is not to say that Bowles is without a remedy. But under the facts in the record and considering them in the light most favorable to him, such a remedy cannot be found under the rights afforded by the Constitution.

Accordingly, the Court, being otherwise sufficiently advised, **IT IS ORDERED** that:

(1) The 42 U.S.C. § 1983 claim against the ACH Defendants are **DISMISSED WITH PREJUDICE**;

(2) Defendants' motion for summary judgment (DE 63) is **GRANTED**;

(3) Defendants' motion to exclude (DE 64) IS **DENIED** as **MOOT**;

(4)  A separate Judgment will be entered contemporaneously with this Opinion and Order; and

(5) This matter shall be **STRICKEN** from the Court's active docket.

Dated November 30, 2020.



KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY